| | |
|---|---|
| CENVEO CORP.,<br><br>               PLAINTIFF,<br><br>v.<br><br>SOUTHERN GRAPHIC SYSTEMS, INC., MIKE AUSTIN, SHAWN AUSTIN, TOM AUSTIN, PAUL PEDERSON, EMILY RYAN, AND SUSAN SPEARS,<br><br>               DEFENDANTS. | CIVIL NO. 08-5521 (JRT/AJB)<br><br><br>**ORDER ON MOTION TO STRIKE AND REPORT & RECOMMENDATION ON PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT** |

Richard S. Busch (pro hac vice), King & Ballow Law Offices, 315 Union Street, Suite 1100, Nashville, Tennessee 37201; and

Jonathan S. Parritz and Haley N. Schaffer, Maslon Edelman Borman & Brand, LLP, 90 S 7th Street, Suite 3300, Minneapolis, Minnesota 55402 (for Plaintiff);

Frederick E. Finch, Jonathan P. Norrie, and Jeffrey R. Mulder, Bassford Remele, PA, 33 S. 6th Street, Suite 3800, Minneapolis, Minnesota 55402-3707 (for Defendants).

## I.    INTRODUCTION

This action came before this Court, United States Magistrate Judge Arthur J. Boylan, on Plaintiff's Motion for Default Judgment [Docket No. 148]. The action was referred to this Court for report and recommendation under 28 U.S.C. § 636 and D. Minn. LR 72.2(b). [Docket No. 208.] There was a hearing on the motion on April 16, 2010. [Docket No. 224.] Richard S. Busch and Jonathan S. Parritz appeared on behalf of Plaintiff. Frederick E. Finch appeared on behalf of Defendants. Prior to the hearing and at the hearing, Defendants moved to strike Plaintiff's April 15, 2010 letter and attachment sent to this Court.

For the reasons set forth below, **IT IS HEREBY ORDERED** that Defendants' Motion to Strike Plaintiff's April 15, 2010 letter and attachment is **GRANTED**; **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Default Judgment [Docket No. 148] be **GRANTED IN PART** and **DENIED IN PART**.

## II.    PROCEDURAL BACKGROUND

This case arises out of Defendant Southern Graphic Systems, Inc. (SGS) hiring Defendants Mike Austin, Shawn Austin, Tom Austin, Paul Pederson, Emily Ryan, and Susan Spears away from Plaintiff Cenveo Corp. The factual allegations made in connection with Plaintiff's motion will be discussed within the Discussion section of this Report and Recommendation. To properly consider Defendants' motion, it is important to discuss the procedural history of the motion practice and the parties' correspondence with this Court.

Plaintiff brought a Motion for Preliminary Injunction. [Docket No. 17.] It appears from the record that after the hearing on the Motion, Plaintiff sent United States District Court Judge John R. Tunheim a letter with respect to the Motion. Defendants filed a letter objecting to Plaintiff's submission. [Docket No. 47.] On January 22, 2009, Judge Tunheim issued an Order granting in part and denying in part Plaintiff's motion for preliminary injunction. [Docket No. 52.] On April 8, 2009, this Court issued the Pretrial Scheduling Order.[1] [Docket No. 56.] On May 22, 2009, this Court issued a Protective Order. [Docket No. 21.]

On January 11, 2010, Plaintiff brought a Motion to Compel Discovery Concerning Legal Advice. [Docket No. 106.] In connection with the motion, Plaintiff filed a one-paragraph letter requesting permission to file a "short reply . . . necessary to rebut a faulty legal argument asserted by Defendants." [Docket No. 116.] This Court granted Plaintiff's request to file a three-

---

[1] There have been four amended Pretrial Scheduling Orders to date. [Docket Nos. 78, 103, 105, 126.]

page reply. [Docket No. 117.] Following a hearing on the Motion to Compel, Plaintiff's motion was granted "to the extent that, on or before February 14, 2010, Defendants must notify Plaintiff whether they intend to rely on advice of counsel as a defense." [Docket No. 127.]

On February 12, 2010, following a telephone conference with the parties, this Court issued an Order directing the parties to follow this Court's interpretation of the Fourth Amended Pretrial Scheduling Order and Fed. R. Civ. P. 30(b)(6). [Docket No. 128.]

On February 19, 2010, Plaintiff brought another Motion to Compel. [Docket No. 130.] On February 22, 2010, Defendants brought a Motion for a Protective Order. [Docket No. 135.] Defendants' motion was granted in part [Docket No. 171] and Plaintiff's motion was denied. [Docket No. 171.]

On February 26, 2010, Plaintiff brought a Motion to Compel Interrogatory Responses. [Docket No. 142.] In connection with this Motion, Plaintiff filed a brief, one-paragraph letter requesting permission to file a reply to Defendant's memorandum of law. [Docket No. 177.] This request was denied [Docket No. 179] and Plaintiff was denied all of the relief it sought within its motion, but, Defendants were ordered to respond to a different interrogatory.[2] [Docket No. 207.]

On February 26, 2010, Plaintiff brought the present Motion for Default Judgment as to all Defendants. [Docket No. 148.] Plaintiff filed a Memorandum in Support of its Motion [Docket No. 150] as well as the Declaration of Richard S. Busch, which included 50 exhibits. [Docket No. 151.] Defendants filed their Memorandum in Opposition [Docket No. 188], which was accompanied by five declarations. [Docket Nos. 189-193.] Plaintiff filed a motion to strike Defendants' Memorandum in Opposition. [Docket No. 195.] Plaintiff's Motion to Strike was denied and Plaintiff was granted seven additional days in which to file a reply brief. [Docket No.

---

[2] Plaintiff's request for clarification on this Order was denied. [Docket No. 215.]

204.] On April 5, 2010, Plaintiff filed its reply brief [Docket No. 210] as well as the second Declaration of Richard S. Busch, which included 66 exhibits. [Docket No. 211.]

Plaintiff also filed a Motion to Amend its Second Amended Complaint to Add a Claim for Punitive Damages. [Docket 164.] In connection with this motion, Plaintiff filed a letter requesting leave to file a reply brief in response to Defendants' memorandum of law. [Docket No. 184.] This letter was two-pages long; in addition to requesting leave to file a reply brief, Plaintiff summarized Defendants' arguments and Plaintiff's responsive arguments. Defendants filed a letter objecting to Plaintiff's letter on the grounds that it included the substance of Plaintiff's requested reply brief, and Defendants requested sanctions. [Docket No. 186.] Plaintiff filed a responsive letter.   [Docket No. 187.]   Plaintiff's request to file a reply brief and Defendants' request for sanctions were denied.  [Docket No. 203.]

On March 31, 2010, there was a hearing on Plaintiff's Motion to Amend its Second Amended Complaint to Add a Claim for Punitive Damages. [Docket No. 206.] On the morning of the hearing, Plaintiff delivered an "Exhibit" to this Court. This Court later told Plaintiff that it could file the Exhibit or e-mail it to chambers, and Plaintiff chose to file the Exhibit. [Docket No. 205.]  Richard Busch reported at the hearing that the Exhibit outlined erroneous citations within Plaintiff's motion papers. Defendants objected to the late submission on the record. [Docket No. 206.] On April 1, 2010, Plaintiff sent this Court a letter via e-mail responding to a question asked during oral argument and notifying the Court that Plaintiff had located another error within its memorandum of law. Attached to Plaintiff's letter was a document Plaintiff wished to submit in support of its motion. Later that day, Defendants sent a letter objecting to Plaintiff's letter on the grounds that it included legal arguments.

The hearing on the present motion was scheduled for April 16, 2010. On April 15, 2010, Plaintiff's sent this Court a two-page letter via e-mail. The letter requested that this Court receive and consider a declaration, which was attached to the letter, in advance of the hearing scheduled for the following day. Later that day, Defendants sent this Court a letter via e-mail objecting to Plaintiff's letter on the grounds that it violated D. Minn. LR 7.1.  Defendants renewed their objection at the hearing. Their objection was taken under advisement and granted Defendants leave to file a reply brief due to the fact that Plaintiff's reply brief contained what appeared to be new arguments and additional evidence. [Docket No. 225.]

### III.     MOTION TO STRIKE

A party bringing a dispositive motion filed within the United States District Court for the District of Minnesota must file a notice of hearing, motion, memorandum of law, affidavits and exhibits, and proposed order at least 42 days prior to the hearing. D. Minn. LR 7.1(b)(1). The responding party must file its memorandum of law and affidavits and exhibits 21 days prior to the hearing. *Id.* at 7.1(b)(2). "The moving party may submit a reply memorandum of law by filing and serving such memorandum at least 14 days prior to the hearing. A reply memorandum may not raise new grounds for relief or present matters that do not relate to the response." *Id.* at 7.1(b)(3). The Local Rules also provide that, "[e]*xcept with permission of the Court*, no memorandum of law will be allowed except as provided in these rules." *Id.* at 7.1(g) (emphasis added).

Defendants' motion to strike Plaintiff's April 15, 2010 letter and attachment is hereby granted.  Plaintiff's letter is not permitted by the Local Rules.  First, it contains legal arguments. Second, it submits additional evidence.  Third, the letter was sent the day before the hearing on the motion.  Besides being in contravention with the Local Rules, as a practical matter there is no

way for the Court or opposing counsel to meaningfully consider a new factual submission one day prior to a dispositive motion hearing.

There appears to be a pattern of disregard for the Local Rules. Plaintiff was explicitly put on notice as to this issue on December 4, 2008, by Defendants' letter objecting to a submission after a hearing on a motion. Plaintiff has also previously demonstrated the ability to abide by the Local Rules, when Plaintiff submitted brief letters requesting the leave to file reply briefs. [*See* Docket Nos. 116, 117.] Notwithstanding this knowledge, Plaintiff filed what amounted to an additional memorandum of law on March 26, 2010. [Docket No. 184.] Plaintiff delivered to this Court an Exhibit on the day of the hearing on Plaintiff's Motion to Amend, and on the day following the hearing, Plaintiff sent a letter responding to a question at the hearing and submitting an additional exhibit.[3] Plaintiff also sent what amounts to an additional memorandum of law and an exhibit in connection with the present motion. Plaintiff also submitted a reply memorandum of law, which contained 66 exhibits and arguments that were not raised within its initial brief.[4]

There needs to be a remedy to ensure that this litigation proceeds in a just fashion, in accordance with the Rules. *See, e.g., Hartford Fire Ins. Co. v. Clark*, No. 03-CV-3190 (PJS/JJG), 2010 WL 428803, *2 (D. Minn. Jan. 29, 2010) (ordering that counsel was not permitted to charge its client in connection with its submissions not permitted by the Local Rules). Therefore, it is hereby ordered that all future correspondence (excluding telephone conversations) with this

---

[3] These submissions will be addressed within this Court's order on Plaintiff's Motion to Amend.

[4] The Local Rules preclude Plaintiff from raising new issues and submitting affidavits and exhibits in connection within a reply memorandum of law. This Court permitted Defendants the opportunity to file a responsive brief to Plaintiff's reply because Plaintiff's reply introduced new arguments and new exhibits.

Court shall be sent by local counsel for Plaintiff. In addition, all future filings by Plaintiff shall include an affidavit by local counsel attesting that local counsel has reviewed the submissions for compliance with the Local Rules. Pro hac vice counsel is granted leave to file and correspond with the Court outside of the requirements set forth herein if such action is for the purpose of notifying the Court of a conflict of interest between pro hac vice and local counsel.

## IV.    MOTION FOR DEFAULT

Plaintiff brings the present motion against all Defendants and moves for this Court to report that all Defendants (1) intentionally destroyed documents; (2) intentionally failed to preserve documents; (3) intentionally failed to produce documents; (4) intentionally failed to search for documents; (5) made false statements within discovery responses and declarations; and (5) committed perjury. (Mot. for Default Judgment 1, Feb. 26, 2010.) Plaintiff requests that this Court recommend that Defendants answer be stricken and default judgment be entered against all Defendants "pursuant to Rule 37(b)(2)(C) of the Federal Rules of Civil Procedure, and pursuant to this Court's inherent contempt power." (*Id.*)

### *1.    Plaintiff failed to meet its burden as to all of the Defendants.*

Plaintiff brought its motion against all of the individually named Defendants: SGS, Mike Austin, Shawn Austin, Tom Austin, Paul Pederson, Emily Ryan, and Susan Spears. (Mot. for Default Judgment 1, Feb. 26, 2010.) Plaintiff has presented no evidence or argument as to how Paul Pederson or Emily Ryan have intentionally destroyed documents, intentionally failed to preserve documents, intentionally failed to produce documents, intentionally failed to search for documents, made false statements within discovery responses and declarations, committed perjury, or done absolutely anything to warrant striking the answer as to them and entering default judgment against them. Likewise, Plaintiff only cites the testimony of Defendant Tom

Austin to prove Plaintiff's allegation that Defendant Shawn Austin committed perjury. Where two witnesses have contradictory testimony either one could potentially be committing perjury or both can be truthfully testifying as to their memory of events. Nevertheless, because Plaintiff does not argue that Tom Austin committed perjury and because Plaintiff offers no evidence that Pederson or Ryan impeded the judicial process, this Court recommends denial of Plaintiff's motion as it relates to Defendants Tom Austin, Pederson, and Ryan.

## 2. *Plaintiff has failed follow the proper procedure for obtaining Plaintiff's requested relief.*

Plaintiff requests that this Court recommend entry of default judgment against Defendants based upon Fed. R. Civ. P. 37(b)(2)(C) and the District Court's "inherent contempt power." But, Rule 37(b) and this Court's "inherent contempt power" cannot provide Plaintiff with its requested relief.

Federal Rule of Civil Procedure 37(b)(2) concerns a party's failure to comply with a "court order" to provide or permit discovery. Rule 37(b)(2)(C) pertains to the payment of expenses incurred in bringing a motion following the failure to comply with a "court order" "instead of or in addition" to:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

> (iii) striking pleadings in whole or in part;

> (iv) staying further proceedings until the order is obeyed;

> (v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii). Rule 37(b)(2)(C) does not discuss or concern default judgment and it cannot be a basis for default judgment.

Furthermore, Fed. R. Civ. P. 37(b) has no application to the present case because Plaintiff has not cited to any "court order" with which Defendants have failed to comply. The Pretrial Scheduling Orders provide deadlines and some limited constraints for discovery. Plaintiff has not cited to any part of the Pretrial Scheduling Orders with which Defendants have failed to comply. Likewise, Plaintiff has not cited to any part of the Protective Order [Docket No. 58] with which Defendants have failed to comply. Finally, Plaintiff has not cited to any other Orders [Docket Nos. 127, 128, 171, 207], with which Defendants have failed to comply. Thus, because Plaintiff is not seeking an order compelling production or answers, and because Plaintiff has not cited to an order with which Defendants have failed to comply, Fed. R. Civ. P. 37 cannot provide Plaintiff with its sought relief.

Similar to an order under Rule 37(b), "[a] contempt order must be based on a party's failure to comply with a 'clear and specific' underlying order." *Chaganti & Associates, P.C. v. Nowotny*, 470 F.3d 1215, 1223 (8th Cir. 2006) (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 545 v. Hope Elec. Corp.*, 293 F.3d 409, 418 (8th Cir. 2002)); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S. Ct. 2123, 2132 (1991) (stating "the underlying concern that gave rise to the contempt power was not merely the disruption of court proceedings. Rather, *it was disobedience to the orders of the Judiciary*, regardless of whether such disobedience interfered with the conduct of trial" (emphasis added) (quotation omitted)); *Black's Law Dictionary* (8th ed. 2004) (defining "civil contempt" as the "failure to obey a *court order* that was issued for

another party's benefit" (emphasis added)). A District Court "has inherent power . . . to levy sanctions in response to abusive litigation practices." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 765, 100 S. Ct. 2455, 2463 (1980) (citing *Link v. Wabash R. Co.*, 370 U.S. 626, 632, 82 S. Ct. 1386, 1389 (1962)). But, as noted by the United States Supreme Court, the "contempt sanction" is just one of these powers. *Id.* at 764, 100 S. Ct. at 2463. For the reasons stated above, Plaintiff cannot obtain relief by appealing to this Court's inherent contempt authority.

Plaintiff's failure to cite any authority capable of providing Plaintiff with its requested relief is grounds for denying Plaintiff's motion outright. Nevertheless, further consideration of Plaintiff's motion is warranted because this Court can grant Plaintiff's requested relief pursuant to its inherent authority and an allegation of obstructing the judicial process warrants serious consideration by the Court.

### 3. Plaintiff has failed to meet its burden to show perjury.

"The inherent powers of federal courts are those which are necessary to the exercise of all others." *Roadway Exp., Inc.*, 447 U.S. at 764, 100 S. Ct. at 2463 (quotation omitted). For example, "the inherent power . . . allows a federal court to vacate its own judgment upon proof that a fraud has been perpetrated upon the court." *Id.* at 44, 111 S. Ct. at 2132. Because perjury is fraudulent testimony, whether by oath or affirmation, when a witness commits perjury within the context of a civil case, a District Court has inherent authority to levy sanctions necessary to avert or correct a judgment based upon such fraudulent testimony. *See Baycol Steering Committee v. Bayer Corp.*, 419 F.3d 794, 804 (8th Cir. 2005) (defining "perjury"). For example, the Eighth Circuit Court of Appeals affirmed a dismissal of a plaintiff's claims where the plaintiff lied within her deposition and her answers to the defendant's interrogatories. *Martin v. DaimlerChrysler Corp.*, 251 F.3d 691, 695 (8th Cir. 2001); *see also Chrysler Corp. v. Carey*,

186 F.3d 1016, 1020 (8th Cir. 1999) (affirming the striking of an answer and entering default judgment where multiple answers to interrogatories, document requests, and deposition testimony "were plainly perjurious and not credible"); *Pope v. Federal Exp. Corp.*, 974 F.2d 982, 984 (8th Cir. 1992) (affirming dismissal of a plaintiff's claims where the District Court found that the plaintiff had manufactured a note, allegedly written by one of the defendant's employees, which the plaintiff produced in response to a discovery request and testified about during her deposition).

"'A witness testifying under oath or affirmation violates [the federal perjury statute] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *Baycol Steering Committee*, 419 F.3d at 804 (quoting *United States v. Dunnigan*, 507 U.S. 87, 94, 113 S. Ct. 1111 (1993)). In *Martin*, the plaintiff testified in her deposition that she was never part of any previous lawsuits, despite the fact that she was the plaintiff in two prior lawsuits with identical claims. *Martin*, 251 F.3d at 693. The Plaintiff in *Martin* also responded in her interrogatories and deposition that she only received treatment by professionals in St. Louis, Missouri, despite the fact that her medical records revealed that she received treatment in Oklahoma and the filings within her previous divorce proceeding showed that she received treatment in Oklahoma. *Id.* at 693. In *Martin*, either the court or medical records were false or the Plaintiff's deposition testimony and affidavit were false. *See* Minn. Stat. § 609.48, subd. 3 (stating that perjury is shown in part where "the declarant has made two inconsistent statements under such circumstances that one or the other must be false"). Furthermore, the Eighth Circuit Court of Appeals has stated that showing that a witness's statement "may have been contradicted by another witness" or that a witness's "statements are not entirely consistent" are not sufficient to

show perjury. *United States v. Nelson*, 970 F.2d 439, 443 (8th Cir. 1992). These lines of authority support the proposition that perjury must be proven definitively before a Court can exercise its inherent authority to levy sanctions that preclude the jury from reaching its own conclusion as to the testimony.

Plaintiff alleges as follows:

1. Katie Langan, an SGS employee, committed perjury because her deposition testimony is contradicted by the deposition testimony of John O'Donnell, a former SGS employee, and Bill Klocke, an SGS employee. (Pl.'s Mem. 17-18, Feb. 26, 2010.)

2. Jim Dahmas, CFO of SGS, committed perjury because his deposition testimony is contradicted by the deposition testimony of Langan, O'Donnell, and Klocke. (*Id.* at 19-20.)

3. Mike Austin committed perjury because his deposition testimony is contradicted by the deposition testimony of Langan, O'Donnell (in some instances recounting the statements of Langan and Mike Austin), and Klocke. (*Id.* at 20-25.)

4. Shawn Austin committed perjury because his declaration, interrogatory response, and deposition are contradicted by Tom Austin's deposition testimony. (*Id.* at 25-27.)

5. Susan Spears committed perjury because her deposition testimony is contradicted by O'Donnell's deposition testimony. (*Id.* at 27.)

6. Klocke committed perjury because his declaration is contradicted by the testimony of Langan and O'Donnell. (*Id.* at 27-28.)

Plaintiff's allegations require the Court to conclude, for example, that Langan and Klocke committed perjury in some statements, but testified truthfully in other statements, which in turn

proves that someone else committed perjury.[5]  In the case of Plaintiff's allegations against Mike Austin, Plaintiff asks this Court to rely upon Langan's statements to prove Mike Austin committed perjury in one statement but to disregard Langan's testimony where she corroborates another allegedly perjurious statement made by Mike Austin.  Furthermore, Plaintiff's offer of proof begs the question whether or not O'Donnell committed perjury because O'Donnell is arguably biased by the fact that he was asked to resign by Defendant SGS (Dec. Harmon ¶ 15, Mar. 25, 2010) and his testimony is inconsistent with Klocke, Langan, Dahmas, Spears, and Mike Austin. Finally, Plaintiff's offer of proof is also consistent with proving the fallibility of human memory. Thus, Plaintiff has not shown perjury and Plaintiff's allegations demonstrate why resolving issues of credibility—stemming from inconsistencies within testimony and contradictions among witnesses—is a task vested with the jury.

Four allegations warrant further discussion. First, Langan testified that she did not recall being discouraged to use e-mail in connection with the hiring of Mike Austin. (Decl. Busch Ex. 12, at 26:16-25.) Plaintiff contends that Langan committed perjury because O'Donnell, Langan's supervisor during 2008, testified there was such an instruction; Klocke testified that he and Langan were instructed to do so; and Langan testified at a later deposition as follows:

> BUSCH:   Mr. O'Donnell testified that there was a direction within SGS that documents relating to Project Minnesota, when possible, should be faxed rather than e-mailed.
>
> . . . .
>
> LANGAN:   I remember vaguely there was some discussion between John and I about faxing some documents.

---

[5] This Court also notes that Plaintiff requests this Court to credit the testimony of Dahmus, Langan, and Klocke for the purposes of Plaintiff's destruction-of-documents allegation.

(*Id.* at Ex. 16, at 5:7-20.) Furthermore, Plaintiff presented evidence that Langan sent faxes in connection with Mike Austin's hiring. While Plaintiff's offer of proof may arguably rise to the level of showing an inconsistency within Langan's testimony, it falls far short of proving that Langan lied when she testified that she did not recall an instruction to avoid using e-mail.

Second, Plaintiff contends that Mike Austin committed perjury when he testified as follows:

> BUSCH: Prior to your departure from Cenveo, did you ever advise SGS of any names of employees they should go after?
>
> MIKE AUSTIN: I – I don't think so, no.

(Dec. Busch Ex. 20, at 316:20-23.) Plaintiff contends that this testimony constitutes perjury because Klocke testified that he and Mike Austin discussed the fact that getting Susan Spears, Emily Ryan, and Paul Pederson was critical to winning Target's business and Klocke's testimony is corroborated by documents provided to Plaintiff by O'Donnell. (*Id.* at Exs. 30, 31.) While this evidence may call Mike Austin's credibility into question, it does not prove that Mike Austin had the intent to lie much less that he lied when he testified that he "[did not] think" that he discussed with Defendant SGS the names of any Cenveo employees.

Third, Plaintiff contends that Shawn Austin committed perjury when he said that he did not tell Mike Austin that he wanted to cancel a dinner with Best Buy employees because he was considering an offer with Defendant SGS. Plaintiff contends that this statement was a lie because Shawn Austin later admitted that he was "mistaken." Plaintiff has failed to show that Shawn Austin committed perjury. The colloquy in which Plaintiff's counsel questions Shawn Austin about his earlier testimony is as follows:

> BUSCH: Well, you couldn't have told him why [you did not want to go to dinner] because you told me that, earlier under oath, you told us all that you had no conversations with Mike about thinking

about turning in your resignation until after you did. So what possibly could you have told him?

SHAWN AUSTIN: I may have been mistaken.

. . . .

BUSCH: So now, it's your testimony, after being confronted with that and saying you told Mike that you were wanting to cancel the dinner, that, in fact, you did tell Mike, prior to the dinner on September 30th, that you were going to resign from Cenveo and accept an offer from SGS; is that right?

SHAWN AUSTIN: I don't recall what I told Mike.

(Dec. Busch Ex. 34, at 145:20-146:19.) At best Shawn Austin's testimony contains inconsistencies, but his testimony suggests that those inconsistencies stem from confusion, mistake, or faulty memory. Plaintiff has not shown that Shawn Austin intended to lie or that his statement was a lie.

Finally, Plaintiff contends that Klocke committed perjury when he stated, "We have been looking for good production and customer employees for months" (Dec. Busch at Ex. 36, at ¶ 20), because Langan, O'Donnell, and Klocke all testified that there was a hiring freeze during the summer of 2008. Klocke's testimony during his deposition is as follows:

BUSCH: [D]o you know whether there was a hiring freeze at SGS company-wide in 2008?

KLOCKE: May have been. Pretty much it's fairly common, I guess, so there may have been.

(*Id.* at Ex 10, Vol. I at 39.) Both the affidavit and the testimony are too ambiguous for this Court to conclude that they contradict much less that Klocke intended to lie and did so when, in November 2008, he stated that "[w]e have been looking for good production and customer employees for months."

Plaintiff has not met its burden to show that there was perjury. There has been no showing that there were lies and no showing of an intent to lie. Plaintiff has only raised issues of credibility, which are to be resolved by the jury, which can believe or reject the witnesses' testimony in part or in whole. *United States v. Close*, 518 F.3d 617, 620 (8th Cir. 2008). Therefore, this Court recommends that Plaintiff's motion be denied to the extent that it is based upon allegations of perjury. Because Plaintiff does not raise any further contentions about Defendants Mike Austin, Shawn Austin, and Susan Spears, this Court recommends that Plaintiff's motion be denied in whole with respect to these Defendants.

### 4. Plaintiff has shown that there was spoliation of evidence.

Spoliation is the "intentional destruction, mutilation, alteration, or concealment of evidence." *Black's Law Dictionary* 1409 (7th ed. 1999). Sanctions for spoliation of evidence may be imposed under a federal court's inherent powers.[6] *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 267 (8th Cir.1993). The Eighth Circuit Court of Appeals has cited two comparable tests: First, "'[s]anctions are appropriately levied against a party responsible for causing prejudice when the party knew or should have known that the destroyed documents were relevant to pending or potential litigation.'" *Id.* at 267 (quoting *Capellupo v. FMC Corp.*, 126 F.R.D. 545 (D. Minn. 1989)). Second, "'[s]anctions may be imposed against a litigant who is on notice that documents and information in its possession are relevant to litigation, or potential litigation, or are

---

[6] The parties have both briefed the application of federal law as to the issue of spoliation. Although the Eighth Circuit has not decided this issue, see *Stevenson v. Union Pacific R. Co.*, 354 F.3d 739, 746 (8th Cir. 2004), based upon this Court's research, the majority of United States Courts of Appeal have held that the federal law of spoliation applies to diversity actions. *See, e.g., Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009); *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (holding that "federal law of spoliation applies because . . . the power to sanction for spoliation derives from the inherent power of the court, not substantive law"); *see also Fakhro v. Mayo Clinic Rochester*, No. Civ. 02-626 (JNE/JGL), 2004 WL 909740, *2 (D. Minn. Mar. 31, 2004) (holding that, under *Erie*, federal courts sitting in diversity apply the federal law of spoliation).

reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information.'" *Id.* at 267 (quoting *Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F. Supp. 1443, 1455 (C.D.Cal.1984)).

Plaintiff makes three allegations: First, Defendant SGS committed spoliation by establishing policies to not take notes during meetings and to not send e-mails pertaining to the issues in this case. Second, Defendant SGS committed spoliation because Dahmus, Langan, and Klocke destroyed evidence.[7] Finally, Defendant SGS committed spoliation by concealing or failing to disclose evidence.

### i.    *Failure to Create Evidence*

Plaintiff alleges that Ben Harmon, General Counsel for SGS, engaged in spoliation by instructing individuals to not take notes during meetings and to fax documents whenever possible. (Pl.'s Mem. 5, 10-11, Feb. 26, 2010.)  Spoliation of evidence, as a matter of law, does not extend to a party choosing not to create evidence.  To wit, choosing to not compose and send an e-mail, and choosing not to take notes during a meeting are not acts of spoliation.  Spoliation concerns existing evidence that is destroyed or otherwise made undiscoverable.  Even assuming that Plaintiff's factual allegations are true, Plaintiff has presented no authority to support the proposition that these instructions or policies amount to spoliation.

### ii.    *Destruction of Evidence by Dahmus*

---

[7] Within Plaintiff's memorandum, Plaintiff contends that Anthony Waldera destroyed documents. (Pl.'s Mem. 12 n.3.) This Court declines to consider this argument. First, Waldera was not noticed and served in relation to the present motion. Second, Waldera is not a Defendant in this action and Waldera is not an employee of SGS. (Waldera was hired as a consultant to SGS during the summer and fall of 2008.)  Third, Plaintiff has presented no authority for the proposition that the actions of a nonparty relative to discovery can subject a party to sanctions.

There is no dispute that Dahmus destroyed e-mails and documents on his computer because he testified in his deposition that he "delete[s] everything as soon as [he is] done." (Dec. Busch Ex. 15 at 85:1.) The following colloquy is relevant:

> DAHMUS: I have virtually nothing on my computer. That's a standard practice for me. I learned this a long time ago at P&G, delete everything. Just the way I work.
>
> We had a suit back when I was—I was with P&G in 1984. We had a guy from France working for us. He wrote a memo about—we were—we were going to dominate the diaper market. And he barely spoke English. This came up in litigation with Kimberly-Clark, when we sued them on a—on a patent infringement. And they dragged this thing out, and they said, Look, this shows that you guys are trying to dominate the diaper market. And, you know, we—we ended up losing the case. And the takeaway was, delete everything. And I've always practiced that my entire business life.
>
> . . . .
>
> BUSCH: With—with knowledge that this transaction could lead to litigation, either for Mike Austin or SGS or both, and despite that fact that [an attorney] was brought in in early August, you continued to delete everything in your emails. Is that fair to say?
>
> . . . .
>
> DAHMUS: Absolutely.
>
> . . . .
>
> DAHMUS: What I do as a standard practice is delete. Now, if somebody in corporate law said, Stop deleting, I might stop deleting. But I never got that message.
>
> BUSCH: So no one ever told you to stop deleting.
>
> DAHMUS: No, not that I'm aware of. No. At one point, we were asked to forward every document we had associated with this, which I did.
>
> BUSCH: But you didn't have any because you had deleted everything.

DAHMUS:  That's exactly correct.

. . . .

BUSCH: There's no way for us to know whether we've been given everything that is relevant or that we would be entitled to get in discovery because you deleted it. Is that fair to say?

DAHMUS: You got everything that I had. That's all I can tell you.

(*Id.* at 85:1-88:10.)   There is also no dispute that Dahmus destroyed relevant documents. Plaintiff presented this Court with an e-mail, dated October 1, 2008, from Dahmus to O'Donnell, requesting that Mike Austin provide a revenue projection for 2008 based upon the assumption that "all goes as planned." (Dec. Busch Ex. 25, Feb. 26, 2010.) This e-mail was produced from O'Donnell's computer, not from Dahmus's computer.

Because Plaintiff has only presented evidence that documents were destroyed prior to this litigation, this Court interprets Plaintiff's allegation to be that Dahmus destroyed documents pre-litigation. Given that Plaintiff has shown that relevant evidence was destroyed, this Court must consider the factors discussed in *Lewy v. Remington Arms Co.*, 836 F.2d 1104 (8th Cir. 1987). As summarized in *Stevenson v. Union Pacific Railroad Co.*, 354 F.3d 739, 746 (8th Cir. 2004) (citing *id.* at 1112), this Court must consider:

(1) whether the record retention policy is reasonable considering the facts and circumstances surrounding those documents, (2) whether lawsuits or complaints have been filed frequently concerning the type of records at issue, and (3) whether the document retention policy was instituted in bad faith.

In *Stevenson,* the Eighth Circuit Court of Appeals further clarified that, before a district court can order sanctions in cases where documents were destroyed prior to the litigation, the court must find "some indication of an intent to destroy the evidence for the purpose of obstructing or suppressing the truth." *Id.* at 747. "Intent is rarely proved by direct evidence, and a district court

has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *Morris v. Union Pac. R.R.*, 373 F.3d 896, 902 (8th Cir.2004).

In light of the facts within the present case, Dahmus's record retention policy was reasonable until the point that he knew that the documents may become material. Thus, this Court must consider when Defendant SGS became aware that litigation may occur.[8]

In the present case, Defendant SGS began negotiating with Mike Austin sometime in July 2008. On or about October 2, 2008, Mike Austin, Shawn Austin, Paul Pederson, Emily Ryan, and Susan Spears all resigned from Cenveo and began working for SGS. (Compl. at ¶ 41, Oct. 14, 2008.) Plaintiff filed its Complaint on October 14, 2008. [Docket No. 1.] On October 16, 2010, Benjamin F. Harmon IV, General Counsel for SGS, sent an e-mail to Hank R. Baughman (CEO of SGS), Dahmus, Klocke, Langan, O'Donnell, Mike Austin, Shawn Austin, Emily Ryan, Susan Spears, and others, directing them to hold documents relevant to this litigation. (Dec. Harmon, March 25, 2010.)

Plaintiff cites 11 events, which Plaintiff contends evince that Defendant SGS knew that litigation was imminent: (1) Defendant budgeted legal expenses for 2009 and 2010; (2) attorney Frederick Finch was retained in August 2008; (3) also in August 2008, Mike Austin demanded payment of legal expenses to be part of his employment package; (4) employment advertisements were placed in newspapers in August 2008 despite the fact that there was a hiring

---

[8] There may be some instances in which the collective knowledge within an organization should not be imputed to an individual employee for the purposes of analyzing a spoliation claim. This Court concludes that the knowledge of Defendant SGS can be imputed upon Dahmus because he is Chief Financial Officer of Defendant SGS and the record supports the inference that his knowledge tracked the collective knowledge of the organization. Likewise, this Court concludes that Dahmus's intent can be imputed upon Defendant SGS because he is an officer of the organization and there has been no showing that Dahmus was acting in contravention of a hold document notice or contrary to company policy when he was destroying documents.

freeze; (5) Harmon instructed SGS employees to not take notes at a meeting; (6) Harmon instructed certain SGS employees to not use e-mails in connection with the transaction; (7) SGS began accumulating information relative to Plaintiff's layoffs; (8) Baughman testified he was concerned SGS might be sued; (9) documents were kept confidential; (10) Tom Austin was hired in case Mike Austin was tied up in litigation; and (11) SGS kept track of Cenveo employees who called SGS. (Pl.'s Reply Mem. 2-3, Apr. 5, 2010.)

Typically, the acquisition of a new employee from a competitor or even winning business from a competitor does not put a party on notice of potential litigation. Likewise, the retention of an attorney or covert activities undertaken in connection with acquiring new employees are not evidence that a party anticipated litigation. Plaintiff's offer of proof as to the budgeted litigation expenses is too ambiguous for this Court to conclude that Defendant SGS was in fact budgeting for legal expenses. Finally, much of the remaining allegations are of questionable relevance.

Notwithstanding the aforementioned conclusions, Plaintiff met its burden of showing that Defendants SGS anticipated litigation in August 2008. Baughman, the CEO of SGS, testified that he told Langan that he was concerned about a lawsuit. (Dec. Busch Ex. 54, at 162:15-164:16:11, Apr. 5, 2010.) He testified: "My concern right along was, I felt that we would get sued." (*Id.* at 164:10-11.) It is evident that there were negotiations that SGS would pay Mike Austin's legal fees as early as August 21, 2008. (*Id.* at Ex. 21.) It is evident that sometime before September 12, 2008, that SGS had negotiated to pay Mike Austin's legal fees and it appears that Baughman was aware that this was anticipated. (*Id.* at Ex. 6-7.) Defendant Mike Austin's final agreement letter, dated September 26, 2008, states:

> If, after you accept employment with SGS, your prior employer initiates a lawsuit against you personally, SGS will offer its in-house counsel's time to assist where possible with the legal issues in such lawsuit and SGS will pay the cost of your outside counsel

legal fees up to a maximum of $18,750. SGS' obligation to pay such legal fees is subject to your not having breached any of your representations, warranties or covenants set forth below and not having engaged in intentional misconduct.[9]

(*Id.* at Ex. 23.) O'Donnell testified that he was involved in discussions with Dahmus about "Mike expressing concern concerning legal fees or liability."[10] (*Id.* at Ex. 25, at 75:4-9.) In an e-mail, dated September 23, 2008, from Anthony Waldera (who negotiated the agreement between SGS and Mike Austin) to Klocke and Langan, wrote, "Mike needs to use Fred Finch unless there is a conflict there is a conflict of interest. And if Fred is working on issues that relate to both SGS and to Mike, Fred's time is to be heavily weighted/allocated to SGS instead of to Mike." (*Id.* at Ex. 25.)

Defendant SGS was aware that litigation was likely at least as early as August 21, 2008. The CEO of SGS testified that he thought that they might be sued. Furthermore, if Defendant SGS was in negotiations to pay for Mike Austin's legal fees, Defendant SGS knew that Mike Austin was concerned that he would be sued. It makes no sense that Defendant SGS would agree to pay for Mike Austin's legal defense and at the same time conclude that it is not prudent to retain documents in connection with that agreement. At the least, Defendant SGS should have

---

[9] This Court notes that Plaintiff repeatedly uses the term "indemnification" with respect to this provision of the agreement. Indemnification pertains to covering the liability of another. *See Black's Law Dictionary* (8th ed. 2004). This Court has found no evidence that Defendant SGS agreed or negotiated to cover Defendant Mike Austin's liability. There was negotiation and, ultimately, an agreement as to covering some legal expenses.

[10] There are other documents that seem to support that Dahmus was aware of the concern about litigation in the present case. (*See, e.g.,* Dec. Busch Ex. 19, at 42, Ex. 22, Feb. 26, 2010.) This Court did not base its conclusion on these documents because Plaintiff provided no foundation or cross-references such that this Court could determine what documents attached as exhibits to Busch's declaration were discussed within the context of the depositions. At a minimum, if an attorney is presenting a documentary piece of evidence to this Court for consideration, the attorney should also present this Court with an affidavit or deposition testimony providing the requisite foundation for the document.

wanted to retain documents to potentially argue that Mike Austin engaged in intentional misconduct, negating his contractual rights to attorney fees. This conclusion is supported by the fact that Waldera anticipated that there may be a conflict of interest between Defendant SGS and Mike Austin. Finally it makes no sense that Dahmus, the CFO of SGS, would not be aware of negotiations or the financial terms of the agreement.

Dahmus's destruction of documents was in bad faith. Dahmus expressly testified that he deleted his documents in order to thwart discovery with respect to litigation. Dahmus's intent can be imputed upon Defendant SGS. *See supra* n. 8. Therefore, this Court must reach the issues of whether Plaintiff was prejudiced and whether sanctions are warranted. This Court will discuss these issues after considering all of Plaintiff's spoliation allegations.

### iii.   *Destruction of Evidence by Langan*

This Court recommends that Plaintiff's motion be denied with respect Plaintiff's allegation that Langan destroyed documents. Plaintiff contends that the following colloquy proves that Langan destroyed documents:

> BUSCH: Were you the drafter of this document?
>
> LANGAN: Yes.
>
> BUSCH: Would any drafts be on your computer?
>
> LANGAN: If I saved them, but if I didn't, they'd be gone.

(Dec. Busch Ex 12, at 286:19-22, Feb. 26, 2010.) First, this testimony does not prove that Langan destroy documents. Second, Plaintiff has presented this Court with no authority to support the proposition that a person writing a document within a word-processing program has the obligation to click "save." Third, even if this testimony stood for the proposition that Langan

was destroying documents, Plaintiff has not shown that Langan was destroying documents in order to thwart discovery.

*iv.*     *Destruction of Evidence by Klocke*

This Court recommends that Plaintiff's motion be denied with respect to Plaintiff's allegation that Klocke destroyed documents. The following colloquy forms the basis of Plaintiff's claim:

> BUSCH: Just so we're clear, . . . because you concluded that, you know, either preliminary notes were meaningless or notes that you later put into a hard-copy document like this were meaningless, you tossed those notes?
>
> KLOCKE: Yeah, cuss they've been replaced with new notes.
> BUSCH: Sometimes they were replaced with new notes; sometimes they weren't; correct?
>
> KLOCKE: Correct.

(Dec. Busch, Ex. 10, at 81:22-82:7, Feb. 26, 2010.) While this colloquy supports that Klocke destroyed rough notes, Plaintiff has not shown that Klocke destroyed his rough notes with the intent to destroy discoverable information.

*v.*     *Failure to Produce Evidence*

Plaintiff contends that Defendant SGS failed to produce evidence because it did not consult with Langan and Klocke when conducting a keyword search of their computers and that evidence has not been produced from O'Donnell's computer. Plaintiff has not met its burden of showing that Defendant SGS failed to produce evidence.

The Federal Rules of Evidence are replete with provisions to help parties address electronic discovery issues. *See, e.g.* Fed. R. Civ. P. 16(b)(3), 26(a)(1)(A)(ii), 26(f)(3)(C). Rule 37(a) is specifically addressed to obtaining discovery that has not been produced.  Plaintiff did

not bring a motion under Rule 37(a) or object to Defendant SGS's methodology for conducting electronic discovery until this motion. In fact, just the opposite is true.

It is evident from the record that, on June 17, 2009, counsel for Defendant SGS informed Plaintiff's counsel that Defendant SGS did not intend to permit inspection of its hard drives, that counsel conducted its "own inspection of the hard drives of the computers used by Katie Langan and Bill Klocke," and that counsel was "prepared to have [its electronic discovery subcontractor] provide an affidavit describing the methodology, search terms used and results." [Docket No. 151-38.] On June 18, 2009, Frederick Finch and Jonathan S. Parritz signed a computer inspection protocol. [Docket No. 189-4.] The protocol stated that Plaintiff would provide Defendant SGS with keywords for searching Defendant SGS's computers. The company conducting the keyword search received a list of 94 search terms from Plaintiff's counsel. (Dec. Schnabel ¶ 20, Mar. 25, 2010.) Plaintiff's counsel later agreed to reduce the number of keywords. (*Id.* at ¶ 21.) It appears that further negotiation as to the keywords became necessary, but that Plaintiff ceased to participate in this negotiation. (*Id.* at ¶¶ 22-24.)

Plaintiff's objection that Defendant SGS did not involve Klocke and Langan when generating the keywords is disingenuous. Plaintiff's local counsel signed an agreement concerning how discovery would be conducted with respect to Defendant SGS's computers and Plaintiff had the opportunity to negotiate the keywords necessary for the search. Plaintiff has not shown how Defendant SGS departed from this agreement. And, more importantly, Plaintiff has made no showing that Defendant SGS's methodology was flawed. Plaintiff's argument seems to be limited to a contention that the methodology could have been better. Thus, Plaintiff has made no showing that Defendant SGS's keyword search was deficient or that Defendant SGS failed to produce documents that were on Langan and Klocke's computer.

Plaintiff contends Defendant SGS failed to produce documents on O'Donnell's computer. Frederick Finch, Defendants' counsel, contends that he first learned that O'Donnell claimed to have had documents relating to the recruitment of Mike Austin, including copies of e-mails, internal memos, spreadsheets, facsimiles and notes stored on his laptop computer during O'Donnell's deposition on December 2, 2009. (Dec. Finch ¶ 8, Mar. 26, 2010.) In addition to the hold document notice sent out by Harmon, Mr. Finch sent O'Donnell an e-mail "asking him to advise [Mr. Finch] if he possessed various kinds of documents regarding employment of the individual Defendants." (*Id.* at ¶ 6.) Mr. Finch states that he "immediately made arrangements to have the laptop computer located and sequestered." (*Id.*) He made arrangements to have Langan inspect O'Donnell's former office and to have his laptop's hard drive copied and analyzed for documents responsive to the Plaintiff's document requests. (*Id.*) Mr. Finch states that all unprivileged documents found on O'Donnell's computer were provided to Plaintiff's counsel by December 31, 2009, and the parties agreed that Plaintiff could re-depose O'Donnell and Langan. (*Id.*)

Plaintiff contends that Defendant SGS has failed to produce all of its responsive documents because O'Donnell testified that certain documents exist that have not been produced. Plaintiff's offer of proof for this contention is O'Donnell's testimony. Plaintiff also contends that Defendant SGS failed to produce documents because Defendant SGS used the same search method on O'Donnell's computer as was used on Langan and Klocke's computers.

Similar to Plaintiff's contentions relative to Langan and Klocke's computer, Plaintiff has not met its burden as to O'Donnell's computer. Mr. Finch has sworn in a declaration that Defendant SGS produced all relevant, non-privileged documents found on O'Donnell's laptop. While it would have been better for the documents on O'Donnell's laptop to have been produced

at the time they were requested, counsel for Defendant SGS acted appropriately in light of the circumstances. In the absence of showing how the delayed search of O'Donnell's computer was flaw, Plaintiff has not met its burden to show that documents on O'Donnell's computer have not been produced.

     *vi.*    <u>Sanctions</u>

There must be a finding of prejudice to Plaintiff before imposing a sanction for destruction of evidence. *Dillon*, 986 F.2d at 267.

> Because of their very potency, inherent powers must be exercised with restraint and discretion. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process. . . . [Thus,] outright dismissal of a lawsuit . . . is a particularly severe sanction, yet is within the court's discretion.

*Chambers*, 501 U.S. at 44-45, 111 S. Ct. at 2132-33.

Plaintiff has shown prejudice as to Dahmus's destruction of documents on his computer. The scope of Dahmus's involvement is unresolved. The ability to review the relevant documents on Dahmus's computer could have resolved this issue. Beyond this, it is possible that Dahmus's computer contained evidence that could have aided Plaintiff or harmed Plaintiff. Thus, the extent to which Plaintiff has been prejudiced is unknown. Nevertheless, this case is not like *Dillon* in which the automobile that was involved in the accident that gave rise to the lawsuit was destroyed prior to the lawsuit. 986 F.2d at 265. In this case, Plaintiff has the ability to question all of the Defendants and Defendant SGS's employees concerning any documents and communications involving Dahmus.

This Court's consideration of the appropriate sanction is colored by the fact that Plaintiff comes to this Court with unclean hands. Plaintiff has disregarded the Local Rules in its motion practice; Plaintiff brought a motion as to all Defendants but produced no argument as to at least

three of them; and many of Plaintiff's arguments border on baseless. Thus, awarding a sanction in the present case could be viewed as rewarding Plaintiff's behavior in litigating the present case.

This Court has considered the facts and the inherent sanctions at this Court's disposal, see *Capellupo v. FMC Corp.*, 126 F.R.D. 545, 552-53 (D. Minn. 1989), as well as the sanctions listed in Fed. R. Civ. P. 37, which hold persuasive value. Striking the answer and entering default judgment against Defendant SGS is too severe. An adverse inference instruction is ill-suited to the present case because it could serve to prejudice the other named Defendants. Therefore, a monetary sanction is the most appropriate sanction in the present case.

Plaintiff only briefed the sanction of default judgment. The relevant period—from August 21, 2008, until October 13, 2008—included 54 days. A sanction is appropriate for Dahmus's intentional destruction of documents during this period. Therefore, this Court recommends that Defendant SGS be order to pay to Plaintiff the amount of one hundred thousand dollars ($100,000.00).

## V.    ORDER & RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' motion to strike Plaintiff's April 15, 2010 letter and attachment sent via e-mail to this Court is **GRANTED**.

2. All future correspondence (excluding by telephone conversations) with this Court shall be sent only by local counsel for Plaintiffs.

3. All future filings by Plaintiff shall include an affidavit by local counsel attesting that they have reviewed the submissions for compliance with the Rules.

4. Pro hac vice counsel is granted leave to file and correspond with the Court outside of the requirements set forth above if such action is for the purpose of notifying the Court of a conflict of interest between pro hac vice and local counsel.

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Default Judgment [Docket No. 148] be **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Plaintiff's Motion for Default Judgment be **GRANTED** to the extent that this Court recommends

   i. A finding of fact be entered, finding that Defendant Southern Graphic Systems, Inc. intentionally destroyed evidence, by virtue of the fact that Jim Dahmus intentionally destroyed evidence, and that the destruction of evidence prejudiced Plaintiff.

ii.  Defendant Southern Graphic Systems, Inc. be ordered to pay to Plaintiff Cenveo Corp. one hundred thousand dollars ($100,000.00) as a sanction for the destruction of evidence.

2.  Plaintiff's Motion for Default Judgment be **DENIED** in all other respects.


Dated: _____6/16/10_____                    _____s/ Arthur J. Boylan_____
                                                Arthur J. Boylan
                                                United States Magistrate Judge


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before ___July 5, 2010_____.