**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

| | |
|---|---|
| CENVEO CORP., | Civil No. 08-5521 (JRT/AJB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT** |
| SOUTHERN GRAPHIC SYSTEMS, INC., MIKE AUSTIN, SHAWN AUSTIN, TOM AUSTIN, PAUL PEDERSON, EMILY RYAN, and SUSAN SPEARS, | |
| Defendants. | |

Richard S. Busch, **KING & BALLOW LAW OFFICES**, 315 Union Street, Suite 1100, Nashville, TN 37201; Jonathan S. Parritz and Leora Maccabee, **MASLON EDELMAN BORMAN & BRAND, LLP**, 90 South Seventh Street, Suite 3300, Minneapolis, MN 55402 for plaintiff;

Frederick E. Finch and Jeffrey R. Mulder, **BASSFORD REMELE, P.A.**, 33 South Sixth Street, Suite 3800, Minneapolis, MN 55402-3707 for defendants.

This case arises from Southern Graphic Systems, Inc.'s ("SGS") hiring of Mike Austin, Shawn Austin, Tom Austin, Paul Pederson, Emily Ryan, and Susan Spears ("individual defendants" and collectively with SGS, "defendants"). Plaintiff Cenveo Corporation ("Cenveo") had employed the individual defendants immediately prior to their employment at SGS. Cenveo alleges the defendants violated a duty of loyalty, interfered with clients, interfered with employment contracts, committed fraud, and misappropriated trade secrets. Since the Court finds no material facts in dispute to support the claims against defendants Shawn Austin, Tom Austin, Paul Pederson, and

Susan Spears, the Court grants summary judgment to those defendants on all counts. In contrast, since the Court finds the facts alleged support certain claims against SGS, Mike Austin, and Emily Ryan, it denies summary judgment on those claims as set forth below.

**BACKGROUND**

Cenveo provides printing, publishing, and graphic art services and, prior to October 2008, its Minneapolis office was principally engaged in prepress work – preparing materials for printing. One of Cenveo's primary customers was Target Corporation. SGS is a subsidiary of an international corporation in the printing business and only does prepress printing. SGS is a direct competitor of Cenveo.

Mike Austin – whose departure from Cenveo is at the heart of this lawsuit – was a Sales Representative at Cenveo and in charge of the Target account, his largest. To manage that account, Mike Austin assembled a team, many of whom were paid out of his commissions. After months of negotiations with SGS, Mike Austin left Cenveo in late September-early October of 2008 and, within the week, many of his team also left Cenveo for SGS. Within two weeks, Target transferred much of its work away from Cenveo to SGS. None of the defendants had non-compete agreements with Cenveo.

Cenveo brought an action against defendants alleging claims of tortious interference with business relationships, misappropriation of trade secrets, and unfair competition as a result of SGS' hiring of the individual defendants. Defendants move for summary judgment on all counts against all defendants. (Docket No. 216.) For the reasons set out below, the Court grants in part, and denies in part, the motion.

# DISCUSSION

I.   **STANDARD OF REVIEW**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the case, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

II.   **DUTY OF LOYALTY, TORTIOUS INTERFERENCE WITH CLIENTS, AND CONSPIRACY**

   A.   **Facts**

Mike Austin began negotiating with SGS in or around July of 2008 about obtaining a position with the company.  SGS' interest in Mike Austin was, in large part, due to his connections to the Target account.  (*See, e.g.*, Klocke Meeting Notes from July 21, 2008, Busch Decl. Ex. 11., Docket No. 232 ("Move 10-12 million in a year or less, including Target.  Need to get confirmation Target would go along with this . . . .  Target will be the actual deal breaker . . . .).)  Mike Austin and SGS officials determined that to convince Target to move its business from Cenveo to SGS, most of Mike Austin's team at Cenveo would have to move with him.  (*See, e.g.*, O'Donnell Dep. at 418:11-14,

Dec. 12, 2009, Busch Decl. Ex. 5., Docket No. 232 ("The purpose was to bring the entire team over so that Target would . . . be persuaded to move the account because the key members . . . would be [at SGS].").) They also determined that capturing Target's business would be best effectuated if Mike Austin and his team moved to SGS in October, during Target's slower season. (*See, e.g.*, Langan Dep. at 83:8-23, Nov 18, 2009, Busch Decl. Ex. 14., Docket No. 232.)

On August 25, 2008, SGS hired Tom Austin, Mike Austin's father, to work as a consultant. Tom had been laid off by Cenveo on August 12, 2008 and had been engaged in negotiations with SGS for employment prior to his layoff. (T. Austin Dep. at 57:16–110:19, Jan. 8, 2010, Busch Decl. Ex. 7, Docket No. 232.) He was actively working to help Mike Austin obtain employment with SGS. (*Id.*)

Mike Austin provided SGS salary and compensation information related to members of his team prior to leaving Cenveo. (*See* Term Sheet ¶ 3, Busch Decl. Ex. 16, Docket No. 232.) He also provided information on employee salaries after he left Cenveo (O'Donnell Dep. at 56:12–58:3), and hosted a happy hour at the Medina Country Club the day he left Cenveo where SGS officials "pitched" the company to other Cenveo employees. (M. Austin Decl. ¶ 22-24, Apr. 15, 2010, Docket No. 221.) In addition, prior to leaving Cenveo, Mike Austin gave SGS information on the equipment SGS would need to purchase to do the type of work Target needed. (Langan Dep. at 173:6-17.)

Between the time that he began negotiating his position with SGS and when he officially resigned, Mike Austin had many meetings with his contacts at Target and his other customers. (*See, e.g.*, Expense Reports, Busch Decl. Ex. 33, Docket No. 232.)

Former SGS employee John O'Donnell testified that Mike Austin had assurances from Target that they would follow him to SGS when he moved. (O'Donnell Dep. at 30:8-20.) However, all the Target employees deposed in this case stated that Mike Austin did not tell Target he was leaving Cenveo prior to his actual departure. (Schuh Dep. at 12–14, Feb. 19, 2010, Finch Decl. Ex. 15; Atkinson Dep. at 22–25, Feb. 19, 2010, Finch Decl. Ex. 19; Pope Dep. at 17–19, 36–37, Feb. 19, 2010, Finch Decl. Ex. 20, Docket No. 220.)

Emily Ryan, one of Mike Austin's team members at Cenveo, accepted an offer from SGS after the Medina Country Club happy hour. She then tendered her resignation to Cenveo on October 6, 2008, but agreed to stay at Cenveo for two weeks to conclude her work. (Ryan Dep. at 55:6-15, 66:8–68:16, Jan. 13, 2010, Busch Decl. Ex. 41, Docket No. 232.) After announcing her resignation, but prior to leaving Cenveo, Emily Ryan sent an email to Target telling it that "our main sales contact on the Target account (Mike Austin) [has] resigned . . . [and e]very single contact you have worked with at Cenveo will be at [SGS] . . . ." (Ryan Email of Oct. 8, 2008, Busch Decl. Ex. 42, Docket No. 232.) When Target then asked her to stop working on a large piece of Target's business since it was considering redirecting work to SGS, Ryan did not inform Cenveo management. (Ryan Dep. at 85:16–92:4.) She did not, however, talk to Mike Austin about Target's partial withdrawal of business from Cenveo. (*Id.*)

### B. Law and Analysis

#### 1. Conspiracy

"Accurately speaking, there is no such thing as a civil action for conspiracy" under Minnesota law. *GSS Holdings, Inc. v. Greenstein*, No. A07-1573, 2008 WL 4133384, at

*2 (Minn. Ct. App. Sept. 9, 2008) (internal citations omitted). Rather, "a civil conspiracy claim is merely a vehicle for asserting vicarious or joint and several liability, and hence such a 'claim' is dependent upon a valid underlying tort claim." *Carlson v. A.L.S. Enters., Inc.*, No. 07-3970, 2008 WL 185710, at *5 (D. Minn. Jan. 18, 2008). "Civil conspiracy requires the conspirators to have a meeting of the minds as to plan or purpose of action to achieve a certain result." *Steele v. Mengelkoch*, No. A07-1375, 2008 WL 2966529, at *2 (Minn. Ct. App. Aug. 5, 2008).

## 2.  Duty of Loyalty

Employees owe a duty of loyalty to their employers. *Marn v. Fairview Pharmacy Servs., LLC*, 756 N.W.2d 117, 121 (Minn. Ct. App. 2008), review denied (Minn. Dec. 16, 2008); *see also Rehab. Specialists, Inc. v. Koering,* 404 N.W.2d 301, 304 (Minn. Ct. App. 1987) (stating that the employee's duty of loyalty prohibits an employee from competing with the employer while still employed). "[A]n employee breaches the duty of loyalty, and thus engages in employment misconduct, by encouraging a third party to terminate a contract between the employer and the third party [through solicitation]." *Schmidt v. Blue Lily Farms LLC*, No. A08-1398, 2009 WL 2151135, at *2 (Minn. Ct. App. July 21, 2009). However, "[a]n employee has the right . . . while still employed, to prepare to enter into competition with her employer." *Rehab. Specialists, Inc.* 404 N.W.2d at 304. As a result, the Court must determine whether the actions of the individual defendants constitute preparation to compete or actual competition.

> There is no precise line between acts by an employee which constitute prohibited 'solicitation' and acts which constitute permissible 'preparation.' Because of the competing interests, the actionable wrong is a matter of

- 6 -

> degree. Whether an employee's actions constituted a breach of [the] duty of loyalty is a question of fact to be determined based on all the circumstances of the case.

*Id.* (internal citations omitted).

Assuming the facts in a light most favorable to defendants, a reasonable factfinder could conclude that Mike Austin crossed the line from preparation to competition with Cenveo while still under its employ. While he was certainly free to negotiate his own employment, he also supplied information on the salaries of his team members, supplied information on the types of equipment SGS would need to purchase to handle the Target business, and advised SGS on the proper timing to capture the Target business. These actions all arguably cross the imprecise line from mere preparation to competition. The Court finds that Cenveo has produced enough evidence to survive a motion for summary judgment on the issue of breach of the duty of loyalty by Mike Austin.

As to Emily Ryan, a jury could determine that her email to Target while still employed by Cenveo, coupled with her failure to alert supervisors at Cenveo that Target partially withdrew work orders, violated her duty of loyalty to Cenveo. Therefore, the Court finds that Cenveo has met its burden as to Emily Ryan sufficient to survive a motion for summary judgment with regard to its breach of the duty of loyalty claim.

Cenveo has produced no evidence, however, that any of the other individual defendants crossed the line from preparation to competition. The Court therefore grants summary judgment on the breach of loyalty claim as it relates to the remaining individual defendants.

Additionally, SGS never owed Cenveo a duty of loyalty given its status as a competitor. Plaintiff argues that by actively inducing Mike Austin to breach his duty of loyalty to Cenveo, SGS is liable as a joint tortfeasor. As support for this proposition, Cenveo relies on a seventy-year-old Eighth Circuit case, *Falstaff Brewing Corp. v. Iowa Fruit & Produce Co.*, 112 F.2d 101, 103–04 (8th Cir. 1940). In that case, the district court found a conspiracy in the actions of a beer distributor which hired away the entire sales staff that promoted a certain beer for a competitor distributor, which resulted in the beer manufacturer moving its business with the employees. *Falstaff*, however, did not address a breach of the duty of loyalty; rather it addressed tortious interference with contract. Cenveo has cited no caselaw, in the intervening seventy years, in which a court relied upon *Falstaff* for the proposition that plaintiff wishes it to stand for. While there is sufficient evidence of conspiracy in the instant case for tortious interference with business clients, SGS is entitled to summary judgment on the claim of conspiracy to breach a duty of loyalty. Civil conspiracy liability is "predicated upon the tort committed by the conspirators . . . ." *GSS Holdings, Inc.*, 2008 WL 4133384, at *2 (internal citation omitted). Without a duty of loyalty owed, there can be no breach.

Moreover, without concerted action there can be no conspiracy. With no evidence to show that Mike Austin and Emily Ryan engaged in concerted action, the conspiracy claim against them fails as well.

### 3. Tortious Interference with Clients

In order to prevail on a claim for tortious interference with business clients under Minnesota law the plaintiff must prove: 1) the existence of a reasonable expectation of

economic advantage or benefit belonging to plaintiff; 2) that defendants had knowledge of that expectation of economic advantage; 3) that defendants wrongfully and without justification interfered with plaintiff's reasonable expectation of economic advantage or benefit; 4) that in the absence of the wrongful act of defendants, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and 5) that plaintiff sustained damages as a result of this activity. *Harbor Broad., Inc. v. Boundary Waters Broads., Inc.*, 636 N.W.2d 560, 569 (Minn. Ct. App. 2001). Further, competitors have a "preference" in the eyes of the law such that it is not a tort to interfere with a contract if the action "concerns a matter involved in [their] competition [,] . . . the actor does not employ wrongful means[,] . . . his action does not create . . . an unlawful restraint of trade[,] and . . . his purpose is at least in part to advance his interest in [competition]." *United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 633 (Minn. 1981) (quoting Restatement (Second) of Torts § 768 (1979)).

Regarding tortious interference with clients, Cenveo submits no admissible evidence that Mike Austin solicited business from Target for the benefit of SGS prior to his departure. However, it does appear that Mike Austin gave SGS critical information that allowed it to become the clear choice for Target's business. Further, Emily Ryan sent a very suggestive email to Target while still employed at Cenveo. A jury could find that these actions constitute "wrongful means," destroying SGS' privilege as a competitor from tort liability. Further, the concerted nature of coordination between at least SGS and Mike Austin, support a conspiracy claim. Cenveo offered no proof that Emily Ryan's email was the result of any concerted action. As a result, the Court finds that the

claims of tortious interference with clients and the related claims of conspiracy against Mike Austin and SGS survive. The claim of tortious interference with clients against Emily Ryan survives. The Court denies summary judgment for these claims with regard to these three defendants and grants summary judgment to all other individual defendants.

## III. FRAUD

### A. Facts

Cenveo had a process for billing clients that included drawing up an internal invoice on the cost of a job but then billing a client with a discount based on the volume of business the client provided. (Demenge Dep. at 150:13–157:13, Dec. 9, 2009, Finch Decl. Ex. 2, Docket No. 220.) This practice resulted in some individual jobs being "unbillable." (Demenge Decl. ¶12, Dec. 1, 2008, Docket No. 44.) As a result, the general practice was for the salespeople to "write off" or invoice those jobs at zero. (*See id.* ¶ 5.) Mike Austin, Shawn Austin, and Susan Spears turned in a number of invoices just prior to their resignations that were invoiced at zero. (*Id.*) Additionally, some invoices were written to zero based on a pre-pricing index that the customers use to hire out services. Target uses such an index and as a result would only pay for certain charges as a matter of course. (M. Austin Decl. ¶ 31.)

Mike Austin traveled to Hong Kong three to four times a year for Cenveo. (M. Austin Dep. at 124:1–125:25, Sept. 1, 2009, Finch Decl. Ex. 4, Docket No. 220.) In June 2008, during a trip to Hong Kong in his capacity as a Cenveo employee, Mike Austin met with SGS officials and toured SGS facilities. He completed his work for Cenveo in the

same trip, which was paid for by Cenveo. (*Id.*) He did not tell Cenveo that he met with SGS on that trip. (*Id.*)

### B. Law and Analysis

To succeed in a common law fraud claim in Minnesota, a plaintiff must show:

(1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffered pecuniary damage as a result of the reliance.

*Hartman v. Smith*, No. 09-01618, 2010 WL 3735724, at *11 (D. Minn. Sept. 17, 2010) (citing *Valspar Refinish, Inc. v. Gaylord's, Inc.,* 764 N.W.2d 359, 368 (Minn. 2009)).

Plaintiff has failed to provide evidence of either reliance or pecuniary damage as a result of either the write offs or Mike Austin's meetings during his July 2008 Hong Kong trip. If the invoices were zeroed out in error, Cenveo could have simply rewritten the invoices before submitting them to Target, thereby negating reliance. Plaintiff has not at any time even estimated what the loss was from the write-offs assuming they were done improperly, thereby negating a showing of pecuniary damage. Similarly, regarding the trip to Hong Kong, plaintiff has presented no evidence of reliance or pecuniary harm from Mike Austin's use of some of his time on a prescheduled trip to meet with SGS officials. As a result of a lack of showing of either reliance or pecuniary harm based on these activities, the Court grants summary judgment to Mike Austin, Shawn Austin, and Susan Spears on Cenveo's fraud claim. Plaintiffs neither allege nor provide any evidence

of fraud against any other defendants so the Court thereby grants summary judgment to all remaining defendants as well.

## IV. TORTIOUS INTERFERENCE WITH EMPLOYMENT CONTRACTS AND CONSPIRACY

### A. Facts

Tom Austin actively worked to help Mike Austin obtain employment at SGS. (T. Austin Dep. at 57:16–110:19.) Mike Austin provided salary and compensation information to SGS on members of his team. (*See* Term Sheet ¶ 3, Busch Decl. Ex. 16, Docket No. 232.) He also provided information on employee salaries (O'Donnell Dep. at 56:12–58:3), and hosted a happy hour at the Medina Country Club the day he left Cenveo where SGS officials "pitched" SGS. (M. Austin Decl. ¶ 22-24.)

### B. Law and Analysis

Tortious interference with a contract requires: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional procurement of its breach; (4) without justification; and (5) damages resulting therefrom." *Harvey v. Wackenhut Corp.*, No. A05-1684, 2006 WL 1605547, at *4 (Minn. Ct. App. June 13, 2006). Minnesota recognizes a claim of tortious interference with employment that extends to at-will employment agreements. *Nordling v. N. States Power Co.*, 478 N.W.2d 498, 505 (Minn. 1991). One cannot interfere with his own employment, however; the cause of action lies where "a third party meddler . . . wrongfully interferes with the contractual relations of others." *Id.* As stated above, for the conspiracy claim to

survive, the underlying tort must succeed and then plaintiff must show the defendants had a meeting of the minds as to plan or purpose of action.  *Steele*, 2008 WL 2966529, at *2.

While it is clear that SGS sought Cenveo's employees, it is not clear if the general holding in *Nordling* – that a third party meddler can be liable for interfering with an at-will employee's employment – applies to the voluntary resignation of an employee. *Nordling* involved the wrongful discharge of an at-will employee from the meddling of a supervisor.  *Nordling*, 478 N.W.2d at 505.   Courts have extended it to involve meddling by non-supervisors in the context of a **discharge**.  *See, e.g.*, *Hemmah v. City of Red Wing*, No. 06-3887, 2008 WL 544976, at *3 (D. Minn. Feb. 26, 2008); *Metge v. Cent. Neighb. Improv. Ass'n*, 649 N.W.2d 488, 499 (Minn. Ct. App. 2002).  However, Cenveo has cited no precedent in which a court found a cause of action for tortious interference with an employment contract in the context of the **resignation** of an at-will employee.

Further, Minnesota courts have found that there is no meddling when "no wrongful means [were] used and no tortious interference where [the] third-party competitor simply made [a] better offer and [the] employee terminated at-will employment . . . ."  *Tappe Const. Co. v. Siedow*, No. C6-01-731, 2001 WL 1646653, at *4 (Minn. Ct. App. Dec. 26, 2001).  The prohibition against "wrongful means" does not mean the meddler must have a pure heart towards the aggrieved party.  A competitor is entitled to compete.  *United Wild Rice, Inc.*, 313 N.W.2d at 633–34 (Minn. 1981).  And "there will always be some desire on the part of the ex-employee to best the former employer."  *Id.* (internal citation omitted).  The Restatement of Torts discusses the factors a court should consider when determining if an actor's conduct is improper as:

    (a)    the nature of the actor's conduct,

    (b)    the actor's motive,

    (c)    the interests of the other with which the actor's conduct interferes,

    (d)    the interests sought to be advanced by the actor,

    (e)    the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

    (f)    the proximity or remoteness of the actor's conduct to the interference and

    (g)    the relations between the parties.

Restatement (Second) of Torts § 767.

Plaintiff has presented no evidence that anyone other than Mike Austin, Tom Austin, and SGS were involved in soliciting employees to leave Cenveo. As to Tom Austin, a former Cenveo employee, simply helping SGS develop a package to entice Mike Austin to leave Cenveo does not rise to the level of improper conduct. Further, while Mike Austin did provide information on the salaries of some employees, since he paid those salaries out of his own commissions, the Court does not conclude that it rises to the level of improper conduct. Finally, SGS as a competitor of Cenveo was acting within its rights as a competitor in fashioning employment packages that Cenveo's employees would find acceptable. Therefore, the Court grants summary judgment to all defendants on this claim.

## V.    UNJUST ENRICHMENT

### A.    Facts

Plaintiffs do not allege separate facts surrounding this claim.

### B. Law and Analysis

"To establish a claim for unjust enrichment under Minnesota law, the plaintiff must show that the defendant has knowingly received or obtained something of value for which the defendant in equity and good conscience should pay." *Schaaf v. Residential Funding Corp.,* 517 F.3d 544, 553–54 (8th Cir. 2008) (internal citations omitted). Put another way, "[i]n order to establish a claim for unjust enrichment, the claimant must show that another party knowingly received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit." *Schumacher v. Schumacher,* 627 N.W.2d 725, 729 (Minn. Ct. App. 2001).

This claim rests on the success of the other claims. The only claim that remains is the improper solicitation of Cenveo's clients, for which only Mike Austin, Emily Ryan, and SGS remain potentially liable. Therefore, the Court grants summary judgment on this claim to all other defendants.

## VI. MISAPPROPRIATION OF TRADE SECRETS

### A. Facts

Cenveo alleges that Shawn Austin and Susan Spears each took information from Cenveo upon their departure that constituted misappropriation of trade secrets. Spears took a job history report and Shawn Austin took a USB flash drive with unidentified contents. (*See* Prelim. Inj. Order at 9, Docket No. 52.) The Court granted a preliminary injunction prohibiting SGS from using the job history report. (*Id.*) The Court denied Cenveo's request for preliminary relief with regard to the information on the flash drive,

however, in large part because plaintiff could not identify what was on the flash drive. (*Id.*) Plaintiff claims that it is still unable to detail the contents of the flash drive due to defendants' destruction of evidence and so the Court should deny summary judgment on this issue.

>    B.   Law and Analysis

Under Minnesota law, misappropriation is defined as the improper acquisition, disclosure, or use of a "trade secret." Minn. Stat. § 325C.01, subd. 3. In order for information to be considered a "trade secret," the plaintiff must prove that: (1) the information is not generally known or readily ascertainable; (2) the information derives independent economic value from its secrecy; and (3) the plaintiff makes reasonable efforts to maintain secrecy. *Electro-Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 899–901 (Minn. 1983). The burden is on the party asserting misappropriation to establish each factor. *Kratzer v. Welsh Cos., LLC*, No. A06-2284, 2008 WL 1747607, at *7 (Minn. Ct. App. Apr. 15, 2006) (internal citations omitted), *rev'd on other grounds*, 771 N.W.2d 14 (Minn. 2009).

Beyond the Court's determination at the preliminary injunction stage that the job history report constituted a trade secret, plaintiff has offered no other evidence as to how Susan Spears or SGS used the information in a way that would induce liability. Further, Cenveo has not offered any evidence as to what trade secrets may have been on Shawn Austin's flash drive and how they may be in use by SGS. Plaintiff alleges no other action by the other defendants on this claim. Therefore, the Court grants summary judgment to all defendants on this claim.

## VII. UNFAIR COMPETITION

### A. Facts

Plaintiffs do not allege separate facts surrounding this claim.

### B. Law and Analysis

Unfair competition is not a stand-alone tort with specific elements. *Zimmerman Grp., Inc. v. Fairmont Foods of Minn., Inc.,* 882 F. Supp. 892, 895 (D. Minn. 1994) (quoting *Rehab. Specialists, Inc.,* 404 N.W.2d at 305–06). "[I]t describes a general category of torts which courts recognize for the protection of commercial interests." *Id.* In order to pursue a claim for unfair competition, a plaintiff must identify the underlying tort that is the basis for the claim. *Id.* Where a plaintiff bases its claim of unfair competition on the same underlying factual allegations as its other independent claims, the unfair competition claim is duplicative of the independent claims and must be dismissed. *Guy Carpenter & Co., Inc. v. John B. Collins & Assocs., Inc.*, No. 05-1623, 2006 WL 2502232, at *9 (D. Minn. Aug. 29, 2006). The Court therefore grants summary judgment to all defendants on this claim.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part** [Docket No. 216].

1. The motion is **granted** on all claims against defendants Shawn Austin, Tom Austin, Paul Pederson, and Susan Spears. All claims against defendants Shawn Austin, Tom Austin, Paul Pederson, and Susan Spears are **dismissed with prejudice**.

2. The motion is **granted** as to Mike Austin, Emily Ryan, and SGS for Count II (Fraud), Count IV (Tortious Interference with Employees), Count V (Misappropriation of Trade Secrets), and Count VI (Unfair Competition) and those counts are **dismissed with prejudice**.

3. The motion is **denied** as to Mike Austin, Emily Ryan on Count I (Breach of the Duty of Loyalty, only).

4. The motion is **denied** to Mike Austin, Emily Ryan, and SGS on Count III (Tortious Interference with Business Clients), and Count IV (Unjust Enrichment).

5. The motion is **granted** as to Emily Ryan on the conspiracy claim in Count II only and that claim is **dismissed with prejudice**.

DATED: March 25, 2011  
at Minneapolis, Minnesota.

                                                       s/ John R. Tunheim  
                                                        JOHN R. TUNHEIM  
                                                   United States District Judge